# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| SYBRENA COOPER, as Guardian ad Litem<br>for LAVONTE M. COOPER,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:06-CV-161-TS |
| | ) | |
| CITY OF FORT WAYNE, | ) | |
| DETECTIVE STEVEN ESPINOZA, | ) | |
| TIMOTHY STEIN, DETECTIVE ROBERT | ) | |
| KIRBY, DETECTIVE CASEY FURGE, | ) | |
| DETECTIVE FRED RAY, | ) | |
| DETECTIVE EDINA OMERADZIC, | ) | |
| DETECTIVE CRAIG WISE, | ) | |
| DETECTIVE DENISE PHILLIPS, | ) | |
| DETECTIVE JOSHUA HARTUP, | ) | |
| KEVIN ZELT, SCOTT CAUDILL, | ) | |
| SGT. DRUMMER, ERIC KRULL, | ) | |
| DERRICK WESTFIELD, | ) | |
| DETECTIVE KIMBERLY SEISS, | ) | |
| BRIAN MARTIN, MITCHELL MCKINNEY, | ) | |
| BRADLEY SCHULTZ, JUAN BARRIENTES, | ) | |
| SGT. BERNING, KERRY HAYWOOD, | ) | |
| TED DAVIS, and SGT. NOLL, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

On the evening of June 1, 2005, members of the Fort Wayne Police Department executed

a search warrant at a house where they suspected drug dealing activity. Members of the Fort

Wayne Police Department Emergency Services Team (EST) entered the home first to search and

render safe all locations that could conceal a person. The EST found three male occupants whom

---

[1] On April 13, 2007, the Court appointed the Plaintiff's mother, Sabrina Cooper, as the Plaintiff's guardian ad litem.

they placed face down on the floor with their hands secured behind their backs. Vice and Narcotics detectives then entered the house to conduct their search. Although they recovered drugs and seized property, the officers did not arrest the three men. Subsequently, Lavonte Cooper, who lived at the residence and was one of the three men detained during the search, sued the City of Fort Wayne and twenty-three of its officers under 42 U.S.C. § 1983 alleging that they unlawfully searched his home, seized his property, and subjected him to excessive force in violation of the Fourth and Fourteenth Amendments. The Plaintiff also sued for battery and unlawful eviction from and condemnation of his home.

On February 15, 2007, the individual Defendants moved for summary judgment on the federal claims. The Plaintiff responded and the Defendants replied. On April 19, 2007, the Plaintiff filed a motion to file a sur-reply.


### SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A court's role is not to evaluate the weight of the evidence, to judge the credibility of

witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *See Bellaver v. Quanex Corp*., 200 F.3d 485, 492 (7th Cir. 2000). The court must consider the evidence as a jury might, "construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Shepherd v. Slater Steels Corp*., 168 F.3d 998, 1009 (7th Cir. 1999). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Under Northern District of Indiana Local Rule 56.1(b), the Court is to assume that the facts claimed by the moving party and supported by admissible evidence are admitted to exist

without controversy, except to the extent such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence.

## STATEMENT OF FACTS

After Fort Wayne police supervised a confidential informant's controlled purchase of crack cocaine from an African-American male in a house at 4202 South Hanna Street on May 20, 2005, the Allen Superior Court issued a search warrant for the house. The warrant authorized police to enter the house and search for and seize drugs and evidence of drug transactions, including money, firearms, and financial records.

Detective Kimberly Seiss, the case agent for the investigation, gathered a team of Vice and Narcotics detectives to execute the warrant: Detective Steven Espinoza, Detective Robert Kirby, Detective Casey Furge, Detective Frederick Ray, Detective Edina Omeradzic, Detective Craig Wise, and Detective Joshua Hartup. She also requested the assistance of the EST because she learned from the informant that the house was usually occupied by a large group of armed males. Because Detective Seiss considered the warrant to be high risk, EST would go into the home and search and secure all areas that could conceal a person before the narcotics detectives even entered the house. The EST members who were assigned to enter the house at different stages were Lt. Kevin Zelt, Sgt. Scott Caudill, Officer John Drummer, Officer Derrick Westfield, Officer Brian Martin, Detective Mitchell McKinney, Officer Bradley Schultz, Detective Juan Barrientes, Sgt. Scott Berning, Officer Kerry Haywood, Officer Tad Davis, and Sgt. Jon Noll. Officer Eric Krull was assigned to the perimeter and never entered the house.

**A.      The Plaintiff's Account of the Search and Seizure**

The Plaintiff lived in the house at 4202 Hanna Street. His mother lived across the street and rented the house at 4202 for her son beginning some time in May, 2005. Mrs. Cooper also provided the furnishing for the house. Mrs. Cooper testified that the Plaintiff has a learning disability that qualifies him to receive social security benefits. She believes that it is the result of his premature birth and a head injury he suffered when he was three years old.

On the evening of June 1, 2005, the Plaintiff was watching a movie with two other people when he heard a loud boom. He did not know what made the noise and thought it could be gun fire. He also heard banging on the front door. When he heard a second boom, he and the others ran up into the attic, which they accessed through a bedroom. While he was in the attic, the Plaintiff heard glass breaking. The Plaintiff was near the attic stairs when he was grabbed and dragged down the steps to the downstairs floor and hit and kicked. He did not hear anyone identify themselves as police officers.

> Q.      So what happened next, then?
> A.      I guess they saw it from the outside, in the attic, so what happened is, I was right by the stairs in the attic and all I know is I got grabbed and dragged down to the floor, to the downstairs floor. They just dragged all of us, just dragged us.
> Q.      How did they get a hold of you?
> A.      Because my leg, when I was laying there, they just grabbed my legs and dragged me down the attic stairs.
> Q.      So, the stairs were still down, then?
> A.      Yes.
> Q.      Somebody just grabbed your leg and pulled you down?
> A.      Dragged me, hit me, every time I said something. I got hit in the mouth, or whatever, kicked.
> Q.      But somebody grabbed you and pulled you down out of the attic?
> A.      Yes,
> Q.      Before that, did you hear anybody say anything?
> A.      Nobody said nothing.
> Q.      Did you hear anybody calling out, "Police!" or anything like that?

A.      No.
Q.      You never heard anybody say that?
A.      No.

(Pl.'s Dep. 30–31.)

While he was face down on the floor, the Plaintiff's hands were restrained behind his back using flexcuffs. The officers began to ask the Plaintiff questions to elicit general information. The Plaintiff attempted to ask questions, but was kicked each time he tried, "probably over ten times." (Pl. Dep. at 33.) One kick caused a tooth to be pushed back. He was kicked in the face, the back, and the side. He could not tell who kicked him because his head was being kept down on the floor: "[e]very time I looked, they slammed me down in the carpet." (Pl. Dep. at 33–34.) The Plaintiff's mother could see through the open front door from across the street where she was standing. She saw an officer use his boot to shove the Plaintiff's head back on the ground and saw officers stepping on him. According to the Plaintiff, he was also hit once near his forehead with a flashlight, which caused his head to bleed. The Plaintiff's mother said she saw him get hit with a black object in the lower back. One officer pointed a gun at the Plaintiff and told him to "shut up."  Most of the officers were wearing masks.

One officer searched the Plaintiff and found $140, which she confiscated because she said that it was drug money. The Plaintiff told the detectives that the money was from his social security disability check. The officers also took a moped that was at the house.

About twenty minutes after first handcuffing the Plaintiff, an officer cut the restraints off him but told him he had to leave the house. The Plaintiff never returned to the 4202 Hanna Street residence and moved back into his mother's house. The Plaintiff and his mother do not know what happened to his furniture, bedding, and clothing that were still in the house when he left it.

6

Someone else now occupies the house.

**B.      Police Account of the Warrant Service Operation**

**1.      *EST Members***

Upon arriving at the house, Lt. Zelt and Officer Haywood went to the rear door. Lt. Zelt heard a distraction device go off in the front yard and someone shouting that the suspects inside were running toward the back of the house. After Zelt received no response to his knocks on the door and his demands to open the door to execute the search warrant, Officer Drummer, assisted by Sgt. Caudill, rammed the door in. Haywood threw a distraction device into the kitchen. Zelt then led the officers into the house and cleared all the first floor rooms before going into the bedroom that led to the attic. He opened the attic door and shouted for anyone upstairs to show their hands and come down. Three African-American males came down the stairs and were secured by other EST officers. Zelt and Haywood cleared the attic and then went back outside to the perimeter until ordered to clear by Vice and Narcotics.

Officer Drummer and Sgt. Caudill followed Zelt's entry team into the house and secured the basement and then stood on the perimeter until ordered to clear the scene by Vice and Narcotics. They did not encounter any occupants of the house.

The distraction device in the front yard was deployed by Officer Krull, who was part of the perimeter team. He did not enter the house or have contact with its occupants.

 Officer Davis and Sgt. Berning entered the house through the front door and cleared the main living area. They heard other officers shouting subjects down from the attic. Officer Davis assisted in flex-cuffing two individuals. (Officer Schultz cuffed the third person). Sgt. Berning

7

did not have any contact with the occupants of the house. Sgt. Berning and Officer Davis then exited and maintained the perimeter until cleared by Vice and Narcotics.

Officers Schultz and Detective Barrientes were the second entry team. They cleared a bathroom and a closet off the living room. After clearing these areas, they moved to the bedroom where the Plaintiff and two other men were coming down the attic stairs. Detective Barrientes covered the three men while Officers Schultz and Davis cuffed them. After the house was secure, Shultz and Barrientes joined the perimeter.

Officer Martin and Detective McKinney were the third entry team. They cleared a bedroom, but found no suspects. They then cleared to the outside and joined the perimeter until released. They did not have any contact with the occupants of the house.

Officer Westfield and Sgt. Noll were assigned to the fourth entry team. When they entered, they cleared the basement. Finding the basement unoccupied, they returned to the perimeter. As Sgt. Noll was leaving the house, he saw three occupants of the home coming downstairs with their hands on their heads.


**2.**      *Vice and Narcotics*

Once the occupants of the house were secured by EST, Vice and Narcotics Detectives entered to investigate. Detectives Seiss, Espinoza, Kirby, Furge, Ray, Omeradzic, Wise, and Hartup searched the residence. Kirby prepared booking sheets and asked the occupants questions to learn their identity. Seiss questioned the Plaintiff about the $142 he had on him and about the moped found in the house. The Plaintiff said that he collected social security disability benefits, but none of the occupants claimed ownership of the moped. Detective Espinoza also questioned

the Plaintiff about his disability. Except for Kirby, who cut the Plaintiff's restraints, each detective submitted an affidavit denying that they had any physical contact with the Plaintiff.

Detectives found crack cocaine in the attic but because no drugs were found on any of the occupants, Seiss decided to release them. Kirby cut the restraints and told the men they were free to go.

After the detectives completed their search and exited the residence, Kirby contacted, and waited for, a crew to board the rear door that had been damaged during EST's entry.

Detectives Stein and Phillips were not present at 4202 South Hanna on June 1, 2005.

### 3.    *Property Seized*

Detective Hartup was responsible for collecting and photographing evidence during the investigation. He seized two cell phones, marijuana, crack cocaine, $142, mail, and a moped. Detective Furge prepared the tow and inventory sheet for the moped. Omeradzic, Ray, Kirby, Furge, Wise, and Espinoza did not seize any property.

The Defendants submitted the affidavit of Teresa Smith, the Detective in charge of forfeitures for the Narcotics Bureau. I her affidavit, Smith states that she submitted a forfeiture request for the moped and the cash to the Allen County Prosecutor's Office to offset the costs of the narcotics investigation. The Prosecutor has not yet returned a disposition and the moped is being stored.

**DISCUSSION**

**A.      Excessive Force**

The Plaintiff brings his excessive force claim under 42 U.S.C. § 1983. This section is not

a source of substantive rights but instead provides "a method for vindicating federal rights

elsewhere conferred by those parts of the United States Constitution and federal statutes that it

describes." *City of Monterrey v. Del Monte Dunes at Monterrey, Ltd.*, 526 U.S. 687, 749 n.9

(1999).  To prevail on a claim under § 1983, a plaintiff must show that "(1) the defendant

deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2)

the defendant acted under color of state law." *J.H. Exrel. Higgin v. Johnson*, 346 F.3d 788, 791

(7th Cir. 2003) (citing *Reed v. City of Chi.*, 77 F.3d 1049, 1051 (7th Cir. 1996)).

A plaintiff may bring a § 1983 suit against individual officers in either their official or

individual capacity or both. In this case, the Plaintiffs are suing the Defendants in their

individual capacities. In order to establish such a claim under § 1983, the Plaintiff must show

that the Defendants were personally involved in depriving him of his constitutional rights. *See*

*Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 413 (7th Cir. 1997); *Gossmeyer v. McDonald*,

128 F.3d 481, 494 (7th Cir. 1997) (quoting *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994)).

 In cases involving arrest, investigatory stop, or other "seizure" of a free citizen, the

"objective reasonableness" standard of the Fourth Amendment applies. *Wilson v. Williams*, 83

F.3d 870, 874 (7th Cir. 1996) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). To decide

whether the amount of force used was excessive, the court must "examine the totality of the

circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests

was justified by the countervailing government interests at stake." *Jacobs v. City of Chi.*, 215

10

F.3d 758, 773 (7th Cir. 2000).

> The Fourth Amendment test is an objective one, where the officer's subjective good or bad intentions do not enter into the analysis. Instead, we consider factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." We also consider whether the citizen was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties. In the end, the excessive force inquiry "looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended."

*Id.* (citations omitted).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. 396–97. The Supreme Court has emphasized that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id.* at 396.

**1.      *Level of Force Used and Governmental Interest at Stake***

The amount of force that was applied to the Plaintiff on June 1, 2005, is a disputed material fact. According to the Plaintiff, officers dragged him from the attic and handcuffed him face down on the living room floor; they then kicked him at least ten times, shoved his head on the ground, and hit him once with a flashlight when he tried to ask questions or lift his head off the floor; the Plaintiff did not have any weapons, did not resist being handcuffed, was not interfering with the officers' search, was not attempting to flee, and was not otherwise aggressive.

11

The Defendants deny the Plaintiff's version of events, submitting affidavits that they did not apply any physical force to the Plaintiff. They also assert, as they must for purposes of summary judgment, that even if the facts alleged by the Plaintiff are true, they were justified in using the alleged force. To this end, they note that the EST officers were given information that the house was a drug house possibly containing a large number of armed individuals. Against this backdrop, they argue:

> Cooper and his friends ran up to the attic, in an attempt to hide from the officers. Assuming true Cooper's claim that he was dragged downstairs, this act would have been appropriate under the circumstances. If they were unwilling to come downstairs on their own, the officers would be forced to retrieve them. Once Cooper and his friends were secured downstairs, they were required to keep their heads on the ground. If Cooper attempted to raise their heads [sic] and look around, officer may have used their hands or feet to put Cooper's head back on the ground. It was imperative for the officers to have the occupants of the home secured within officer sight, as it minimized the risk of harm to the officers. "[A] warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic effort to conceal or destroy evidence." *Michigan v. Summers*, 452 U.S. 692, 702 (1981). This was, indeed, a warrant to search for narcotics, with additional concerns by officers regarding the possibly [sic] of weapons at the home. Based on that information, the force allegedly used by any or all of the named Defendants was objectively reasonable under the circumstances.

(Def. Mem. at 15 ) (footnote omitted). Although this argument adequately explains why police officers may have been justified in using force to remove the Defendant from the attic, it does not justify the hitting and kicking that the Plaintiff contends occurred after he was laying face down on the floor handcuffed.

The Defendants cite *Summers* for the proposition that officer safety is a government interest that exists when executing a search warrant for drugs, 452 U.S. at 702–03, but they do not indicate how this interest was implicated after the three occupants of the house were removed from the attic and secured and EST had verified that no other people were in the house.

12

The Plaintiff does not dispute that the officers were within their authority to detain him during the search. Indeed, *Summers* gives police authority to detain occupants of a building while executing a warrant for contraband. 452 U.S. at 704–05. But the force the Plaintiff alleges was applied after he was detained, particularly in handcuffs, presents a different scenario. The Seventh Circuit, in addressing these scenarios, has distinguished between force that officers apply before an individual is secured and force that they use after the person no longer presents a risk to officer safety.

In *Sallenger v. Oakes*, the defendant officers were denied summary judgment where the evidence revealed that they "delivered repeated, closed-fists blows and blows with flashlights to the back of [the plaintiff's] shoulders and thighs *after* [he] was handcuffed." 473 F.3d 731, 740 (7th Cir. 2007) (quoting district court's findings of fact); *see also Frazell v. Flanigan*, 102 F.3d 877, 885 (7th Cir. 1996) (noting that "it is one thing to use force in subduing a potentially dangerous or violent suspect, and quite another to proceed to gratuitously beat him"), *overruled on other grounds by McNair v. Coffey*, 279 F.3d 463 (7th Cir. 2002). In *Miller v. Smith*, 220 F.3d 491, 493, 495 (7th Cir. 2000), the court held that summary judgment was not appropriate where the plaintiff alleged that after he was cuffed and laying prone on the ground, an officer kicked him twice in the back, punched him, stepped on his face, and yanked him around by the hair.

The Defendants do not adequately distinguish these cases.[2] Rather, they altogether ignore

---

[2] The Defendants argue that *Sallenger* is not similar because the Plaintiff is not mentally ill like the plaintiff in *Sallenger*, the officers did not use chemical spray, they did not strike the Plaintiff with closed fists and flashlights in excess of twenty-five times, and deadly force was not applied. While those difference do exist, they do not distinguish *Sallenger's* holding that the punches and blows officers delivered to the suspect after they had control over him were unnecessary and unreasonable. 473 F.3d at 740 ("Although closed-fist blows and blows with the flashlight may have been necessary at first, this does not mean that this force was still justified after the handcuffs had been secured.")

the Plaintiff's testimony that he was kicked repeatedly and hit with a flashlight hard enough to

cut his skin. Even in their assertion that they would have been justified in putting the Plaintiff's

head back on the ground had he lifted it, the Defendants do not credit the Plaintiff's

characterization of the action as slamming his face into the carpet. Yet, the reasonableness of law

enforcement using their hands or feet to keep the Defendant's head down during execution of the

search warrant turns, at least in part, on how much force was used. Given the conflicting version

of events, a jury could determine that the degree of force officers used was excessive in relation

to the danger the Plaintiff posed laying handcuffed on the ground.

      The force allegedly applied before the Plaintiff was handcuffed and laying on the ground,

however, is not actionable. *Cf. Sallenger*, 473 F.3d at 740 (distinguishing between force applied

before officers had control over the suspect and force applied after the handcuffs had been

secured); *Frazell*, 102 F.3d at 885 (7th Cir. 1996) (noting that force justified initially by an

individual's resistance does not continue after the person is restrained). The Plaintiff submits in

his deposition that he was dragged down the attic stairs. When asked whether someone just

grabbed his leg and pulled him down, the Plaintiff responded: "Dragged me, hit me, every time I

said something. I got hit in the mouth, or whatever, kicked." (Pl. Dep. at 30.) The testimony is

vague as to whether he was kicked while coming down the stairs (as opposed to only after he

was handcuffed on the floor) because the Plaintiff appears to jump ahead in the sequence of

events and does not identify, in this statement, when he said something that prompted a kick. The

Plaintiff later verifies that he was kicked when he tried to ask questions after the police started

asking him for general information. (Pl. Dep. at 32.) It is undisputed that Vice and Narcotics

Detective Kirby asked general booking questions, but that he did not enter the house until the

EST secured the Plaintiff and left the house. The Plaintiff does not complain about the actual handcuffing. Therefore, the only force alleged to occur before he was handcuffed was being dragged by his legs down the stairs. Even if it could be inferred from the Plaintiff's vague testimony that he was kicked coming down the stairs, the outcome would remain the same given the totality of circumstances facing the officers who discovered the Plaintiff in the attic.

The amount of force used was not excessive when weighed against the governmental interest in ensuring officer safety and avoiding the destruction of evidence. *See e.g., Muehler v. Mena*, 544 U.S. 93, 98–99 (2005) (recognizing that inherent in *Summers'* authorization to detain an occupant is the authority to use reasonable force to effectuate the detention). The officers believed that they were entering a residence where drug dealing occurred and that a large number of armed males could be inside. They witnessed people running evasively toward the back of the house and they could not see into the attic from their position in the bedroom closet. The police were yet unsure how many people were in the house, whether they were armed, and whether they would physically resist being detained. The situation, at this time, was still tense, uncertain, and rapidly evolving. Only with impermissible 20/20 hindsight vision could a trier of fact determine that the level of force applied by the EST officers to remove the Plaintiff from the attic and detain him was unconstitutional.

**2.** ***Liability of Individual Defendants***

While material issues of fact remain regarding the degree of force used, who can be held liable for this force is a separate question. Numerous officers were present at the scene and the Plaintiff cannot identify which Defendants delivered the challenged blows. The Defendants

contend that certain officers were not even in the house during the time the Plaintiff alleges he was kicked and hit. They argue that even those who were in the house during the relevant time frame should be dismissed on summary judgment because the Plaintiff cannot identify who kicked or hit him. The Plaintiff argues that he is not required to identify the officer who used force, and that it is sufficient for him to show that "the officers were engaged in the raid, that they were in the area, that they had involvement in handcuffing/arresting/being around [the Plaintiff] and the other officers, and that, *therefore*, they were either involved in the excessive force or they were bystanders who were equally liable for their actions in standing by and letting other officers use excessive force." Pl. Mem. at 11.

In § 1983 excessive force claims, individual officers have a duty not only to refrain from using unreasonable force but to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (citing *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972)). An officer, who had "a realistic opportunity to step forward and prevent a fellow officer from violating the plaintiff's rights through excessive force but failed to do so," may be held liable. *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000). Acknowledging that failure to intervene can expose an officer to liability, the court in *Miller v. Smith* held that the plaintiff's failure to identify which of two officers hit him, because he was face down, was not fatal to his § 1983 claim. 220 F.3d at 495 ("If, as we are required to do at this point in the case, [the plaintiff's] allegations are taken as true, whichever officer was not directly responsible for the beating was idly standing by. If [the plaintiff] can show at trial that an officer attacked him while another officer ignored a reasonable opportunity to intervene, he can recover.").

The Defendants do not discuss the *Smith* case (and neither was it cited by the Plaintiff). In their reply brief, the Defendants focus on a New York district court's decision where summary judgment was granted to the defendant officers in an excessive force claim because the alleged conduct was not objectively unreasonable and because the plaintiff could not demonstrate each defendant's involvement. *Paul v. City of Rochester*, 452 F. Supp. 2d 223 (W.D.N.Y. 2006) (dismissing excessive force claim because the plaintiff could not identify which of two officers used unreasonable force). Missing from *Paul*, however, is any discussion about liability under a failure to intervene theory. The plaintiff argued only that liability should be apportioned among all the defendants, despite his acknowledgment that only one officer, whom he could not identify, used force. 452 F. Supp. 2d at 228. Because *Paul* does not discuss bystander liability, this Court cannot use it to dismiss the Plaintiff's claims against the Defendants merely because he cannot identify which officers hit him and which stood by and ignored a reasonable opportunity to intervene.

Under this Circuit's precedent, if the Plaintiff can present evidence from which a jury could reasonably infer that a particular Defendant was in the house during the critical time period, a jury must be allowed to determine whether that officer delivered the challenged blows or, if he did not, whether he had sufficient time to intervene or was capable of preventing the harm caused by another officer. This comports with the requirement that individual liability under § 1983 be predicated on personal involvement.

17

a.      *Detectives Stein, Phillips and Krull*

Detectives Timothy Stein and Denise Phillips submitted affidavits in support of summary judgment stating that they were not present for the execution of the challenged search warrant and did not enter the house at any time. On the basis of these representations, the Plaintiff concedes that they are entitled to summary judgment because they were not personally involved in the events that give rise to the Amended Complaint. The Plaintiff also concedes that Officer Eric Krull should be dismissed for this same reason. His affidavit indicates that, although he was a member of the EST that assisted with the execution of the warrant, he was assigned to the outer perimeter and never entered the residence. Summary judgment will be entered in favor of Defendants Stein, Phillips, and Krull.

b.      *Other EST Officers*

Despite the holding in *Miller*, the Defendants are correct in their assertion that it is not enough for the Plaintiff to claim that, because all of the Defendants were at the residence on June 1, 2005, at some point, that each is liable for the alleged constitutional violations. In *Miller*, the defendant officers' presence at the scene and near the plaintiff was not disputed—only their particular actions were challenged. In contrast, the established facts in this case are that certain officers were not in the house during the time the Plaintiff contends he was subject to excessive force and that others did not encounter the Plaintiff at all.

EST members Caudill, Drummer, Westfield, Martin, McKinney, and Berning did not see the Plaintiff during their time inside the house. EST member Noll saw the Plaintiff, but did not have any contact with him. Caudill and Drummer followed Zelt inside the house and secured the

basement. They then went outside to stand on the perimeter until ordered to clear the scene. Martin and McKinney, who were part of the third entry team, cleared a bedroom, found no suspects, and immediately returned to the outside perimeter. Berning entered the house through the front door and cleared the main living area before going back out to the perimeter. Westfield, one of the last to enter the house with his partner Noll, cleared the basement and, finding no one, left the house to join the perimeter. Noll also cleared the basement and on his way out of the house saw the Plaintiff coming down the stairs. He did not have contact with him. The Plaintiff has not submitted evidence to contradict these officers' statements and, thus, it remains undisputed that they did not have contact with the Plaintiff, were not in the house during the critical time period, and were not personally involved in depriving the Plaintiff of his constitutional rights.

Although EST members Davis, Barrientes, Schultz, Zelt, and Haywood, did have contact with the Plaintiff, either because they found him in the attic or helped secure him in the flexcuffs, they likewise cannot be responsible, either as a participant or a bystander, for any excessive force. The Court has already determined that the force used during EST's entry and detention was not unreasonable. It is undisputed that, after completing these duties, the EST officers left the residence to allow the Vice and Narcotics Detectives to execute the warrant. Whether these officers were present during the alleged physical acts is not a fact that could reasonably be resolved in favor of either party. Rather, all the evidence supports the conclusion that these officers did not have contact with the Plaintiff and were not nearby when it is alleged that others had contact.

The Plaintiff has not presented evidence from which a jury could return a verdict for him

as it relates to these officers. Because the designated evidence does not establish that the EST

Officers were even present during the time period that the Plaintiff contends he was beaten, they

are entitled to judgment as a matter of law.

      c.     *Vice and Narcotics Detectives*

The presence of the Vice and Narcotics Detectives in the house after the Plaintiff was

cuffed and laying on the ground is undisputed. Although the Vice and Narcotics Detectives

submit that they did not have physical contact with the Plaintiff, who was already secured when

they entered the house, this contradicts the Plaintiff's testimony that, while they were in the

house executing the warrant, he was kicked, stepped on, and hit with a flashlight. The conflicting

testimony creates a credibility question and a genuine issue of material fact. Because the Plaintiff

has presented evidence from which a jury could find that the Detectives were personally

involved, either because they used unreasonable force or because they ignored a reasonable

opportunity to intervene, the motion for summary judgment must be denied as to Defendants

Seiss, Espinoza, Kirby, Furge, Ray, Omeradzic, Wise, and Hartup.

**B.**     **Qualified Immunity**

Even if the Defendants violated the Plaintiff's Fourth Amendment rights, they will be

immune from suit if reasonable officers could have believed that their conduct was constitutional

in light of clearly established law and the information they possessed at the time. *Anderson v.*

*Creighton*, 483 U.S. 635, 639 (1987); *Frazell v. E.K. Flanigan*, 102 F.3d 877, 886 (7th Cir.

1996).

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier v. Katz*, 533 U.S. 194, 205 (2001). "The police cannot have the specter of a § 1983 suit hanging over their heads . . . as long as their behavior falls within objectively reasonable limits." *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996).

The analysis of a qualified immunity defense requires a two-step inquiry. First, a court must answer the threshold question whether the alleged facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. The Court has already determined that the evidence most favorable to the Plaintiff established a constitutional violation.

Second, assuming that a plaintiff is able to establish a constitutional violation under a favorable view of the facts, "the next, sequential step is to ask whether the right was clearly established." *Id.* In other words, a court must consider whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case. *Id.* The Defendants argue that it was not clearly established as of June 2005 that the force used was constitutionally impermissible under the Fourth Amendment.[3] They focus on their need to remove the Plaintiff from the attic and to have him keep his head on the ground. The Defendants do not address the allegations that officers kicked him at least ten times and hit him with a flashlight after he was

---

[3] The Defendants actually use November 2002 as the relevant date. (Def. Mem. at 23.) It is unclear where this date came from as June 1, 2005, the date of the search, is the proper date for qualified immunity purposes.

21

handcuffed. Perhaps this omission is because the unlawfulness of kicking and hitting a nonresistant, cuffed, and prone occupant of a house that is being searched would have been apparent to the Defendants in light of existing law. *See Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) (affirming district court's denial of summary judgment on basis of qualified immunity because it was not reasonable as a matter of law to shove handcuffed arrestee into car). *Miller* verified that hitting a detainee after he is in handcuffs is unreasonable and that ignoring a realistic opportunity to intervene to stop such conduct also violates a citizen's rights. 220 F.3d at 494. This is not a case where officers should be protected from the "sometimes 'hazy border between excessive and acceptable force.'" *Saucier*, 533 U.S. at 206 (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926–27 (11th Cir. 2000)). Moreover, kicking a secured suspect was plainly excessive such that the Defendants should have known they were violating the Plaintiff's rights. *See Clash*, 77 F.3d at 1048 (holding that clearly established right may be shown if force is so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating a constitutional right).

The Vice and Narcotics Detectives who executed the search warrant are not entitled to qualified immunity.

**C.     Unlawful Search**

In his response brief, the Plaintiff "concedes that the entry into the house at 4202 South Hanna was pursuant to a valid search warrant." (Resp. at 2.) Therefore, his Fourth Amendment claim for unlawful search will be dismissed.

**D.       Unlawful Seizure**

The Plaintiff provides a one-paragraph response to the Defendants' Motion for Summary Judgment on the seizure claim. In it, the Plaintiff contends that the seizure of his property was unconstitutional. He does not identify the particular constitutional provision that was violated or a particular Defendant that committed the offense. He admits that the $142 that was seized from his person was returned.

It is undisputed that the warrant allowed for the seizure of evidence of narcotics and the trafficking of narcotics, including currency, and that the money was returned. It is also not in dispute that Seiss and Hartup seized only cash, a moped, crack cocaine, marijuana, cell phones, and pieces of mail. A forfeiture request for the moped and the cash has been submitted to the Allen County Prosecutor's Office to offset the costs of the narcotics investigation. The moped is being stored until disposition of the forfeiture request.

The Plaintiff does not articulate a violation of his constitutional rights regarding the seizure of the cash or the moped. The Plaintiff's testimony that he lost his furniture and clothing and does not know what happened to it is not sufficient to create a triable issue that the Defendants took this property from his house or were responsible for assuring that he recovered it from the house. The Plaintiff is only speculating that the Defendants are somehow responsible for what happened to his property. Such speculation is not an adequate defense to a summary judgment motion. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991); *Zayre Corp. v. S.M & R. Co.*, 882 F.2d 1145, 1152 (7th Cir. 1989) ("An invitation to speculate does not create a genuine factual issue.").On the record before it, the Court finds that summary judgment on the unconstitutional seizure claim is appropriate.

**E.     Motion to File Sur-Reply**

In his proposed sur-reply, the Plaintiff responds to the Defendants' argument that he cannot maintain a § 1983 action them because he cannot identify which Defendants inflicted the the alleged force. The Plaintiff states that he has identified the officers that were in the house and who could have participated in the excessive force and argues that they should not be dismissed simply because they concealed their identities. The Plaintiff argues that the Defendants acted as a group or a team. He does not attempt to distinguish between the Defendants that were in the house during the time he was kicked and hit and those that had already exited.

The Court has considered the arguments presented in the proposed Sur-Reply in ruling on the motion for summary judgment.

**CONCLUSION AND ORDER**

For the foregoing reasons, the Defendants' Motion for Summary Judgment [DE 31] is GRANTED in PART and DENIED in PART. The Plaintiff's search and seizure claims are dismissed in their entirety. Defendants Stein, Phillips, Zelt, Caudill, Drummer, Krull, Westfield, Martin, McKinney, Schultz, Barrientes, Berning, Haywood, Davis, and Noll are dismissed. The Plaintiff's excessive force claim against Defendants Espinoza, Kirby, Furge, Ray, Omeradzic, Wise, Hartup, and Seiss remain pending. Any claims contained in the Plaintiff's Amended Complaint that were not addressed in the Defendants' Motion for Summary Judgment, and not otherwise dismissed, also remain pending. The Plaintiff's Motion to File Sur-Reply [DE 45] is GRANTED.

The Final Pretrial Conference set for August 13, 2007, at 1:30 p.m. and the jury trial set for August 28, 2007, at 8:30, both before Judge Theresa L. Springmann, are confirmed.

SO ORDERED on May 15, 2007.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT